UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DIST. COURT EAST DIST. WISC
FILED

DEC - 3 2012

AT_____ O'CLOCK_____M
JON W. SANFILIPPO, CLERK

UNITED STATES OF AMERICA,

          Plaintiff,

v.

          Case No. 11-CR-226

BILLY CANNON, SR.,

          Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, James L. Santelle, United States

Attorney for the Eastern District of Wisconsin, and Lisa Wesley, Assistant United States Attor-

ney, and the defendant, Billy Cannon, Sr., individually and by attorney Kent Carlson, pursuant to

Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in a six-count indictment with a forfeiture

provision which alleges violations of Title 18, United States Code, Sections 1343, 1957(a),

and 2.

3.     The defendant has read and fully understands the charges contained in the

indictment. He fully understands the nature and elements of the crimes with which he has been

charged, and those charges and the terms and conditions of the plea agreement have been fully

explained to him by his attorney.

4.     The defendant voluntarily agrees to plead guilty to the following counts set forth

in full as follows:

## THE GRAND JURY CHARGES:
### Background

1.      From at least 2003 through 2007, Defendant Billy Cannon, Sr., was a resident of Milwaukee, Wisconsin, employed as a loan officer with various mortgage banks and mortgage brokers in the Eastern District of Wisconsin. From at least June 2006 through 2007, Cannon worked as a loan officer at United Lending.

2.      United Lending was a company operating as a mortgage broker in the Eastern District of Wisconsin. As a mortgage broker, United Lending provided buyers with access to a wide range of mortgage products offered by different lenders. Cannon's duties and responsibilities as a loan officer for United Lending was to identify lenders offering the most attractive mortgage terms and rates for prospective buyers.

3.      From at least June 2006 through 2007, Margaret Keefe, aka "Peg Keefe," was a closing agent at Badger State Title and Trump Title, both located in Pewaukee, Wisconsin. Keefe's duties and responsibilities as the closing agent were to insure the accuracy of the closing statements submitted to the lenders, and to collect and disburse funds at the closing consistent with the closing statements.

4.      Cannon held three checking accounts at U.S. Bank in Milwaukee, Wisconsin. One of the accounts Cannon controlled was held in the name of Alledi and Associates, LLC. Alledi and Associates, LLC was held out to be a company involved in real estate investment and construction. Alledi and Associates, LLC, did not have any employees, and Cannon was the sole owner. Cannon was also the only person with signature authority on the Alledi and Associates account at U.S. Bank.

### The Scheme

5.      From 2003, and continuing through June 2007, in the State and Eastern District of Wisconsin, and elsewhere,

### BILLY CANNON, SR.,

knowingly devised and participated in a scheme to defraud and to obtain money from banks and real estate lending institutions by means of materially false and fraudulent pretenses, representations, and promises.

6.      Cannon and others would locate residential properties available for purchase on the north and northwest side of the city of Milwaukee.

7.      Cannon and others would pay straw buyers to use their names, credit histories, and signatures on mortgage loan documents to fraudulently obtain funding to purchase the selected residential properties at inflated prices.

8.      The straw buyers often purchased several properties at the same time. The straw buyers never saw the properties to be purchased, did not negotiate the purchase price, did not intend to occupy the properties, and did not intend to make any mortgage payments with respect to these properties.

2

9. As the loan officer for the transactions, Cannon knowingly signed materially false loan applications that were prepared on behalf of the straw buyers. The loan applications Cannon signed and caused to be submitted to the lender contained numerous false representations including an inflated purchase price for the properties.

10. The loan applications also overstated assets and income, and understated liabilities for the straw buyers.

11. In addition to the false loan applications, false closing statements were submitted to the lenders. The closing statements falsely stated that the straw buyers were bringing their own funds to the closing. In truth, Cannon withdrew funds from the Alledi and Associates account at U.S. Bank to satisfy the cash due from the borrower at closing.

12. The closing statements also falsely reflected that the seller received the bulk of the proceeds from the real estate transaction. In truth, Keefe did not disburse the funds as reflected in the closing statements.

13. Instead, Keefe fraudulently issued and endorsed checks payable to Alledi and Associates, LLC, at the closings. Keefe disbursed at least $20,000 of the seller's funds to Cannon at each closing, and did not disclose these payments to the lender.

14. Keefe concealed the payments to Cannon by issuing and endorsing checks at closing for the full amount due to the sellers as reflected in the closing statements. Keefe then caused these checks to be forwarded to the lender. In truth, the sellers never received the check.

15. Based on the false representations in the loan applications and the closing statements, banks and lending institutions funded the loans through the use of interstate wires.

16. After completing the closings on the properties, the straw buyers failed to make payments on the mortgages, and the properties went into foreclosure shortly after their purchase. As a result, lending institutions incurred losses of more than $400,000.

### Execution of the Scheme

**THE GRAND JURY FURTHER CHARGES:**

17. On or about the dates set forth below, in the State and Eastern District of Wisconsin and elsewhere,

**BILLY CANNON, SR.,**

for the purpose of executing the above described scheme, knowingly, and with intent to defraud, caused to be transmitted in interstate commerce by means of a wire communication, certain signs, signals, and sounds which accomplished the transfer of funds for each count detailed below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| **Three** | 5/15/07 | Approximately $123,599.77 wired from Regions |

| | | Funding in Atlanta, Georgia, to the escrow account of Trump Title at M&I Bank, Milwaukee, Wisconsin, for the purchase of property at 5327 N. 35th Street, Milwaukee, Wisconsin. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FIVE

### THE GRAND JURY FURTHER CHARGES:

18.     On or about the dates set forth below, in the State and Eastern District of Wisconsin,

### BILLY CANNON, SR.,

did knowingly engage and attempt to engage in the following monetary transactions through a

financial institution, affecting interstate and foreign commerce, in criminally derived property of a

value greater than $10,000, which funds were proceeds derived from specified unlawful activity, that

is, wire fraud, in violation of Title 18, United States Code, Section 1343 and 2, which transactions

are detailed for each count below:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Five | 6/15/2007 | Cannon caused cashier check number 510369883 in the amount of $11,308.88, drawn on U.S. Bank Account ending 3298 for Alledi and Associates, to be issued and delivered to Trump Title for the payment of buyer's fees associated with the purchase of 3127 N. 39th Street in Milwaukee, Wisconsin. This transaction involved proceeds from the fraudulent loan to purchase 5327 N. 35th Street, Milwaukee, Wisconsin. |

All in violation of Title 18, United States Code, Sections 1957(a) and 2.

5.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of

the offenses described in paragraph 4. The parties acknowledge and understand that if this case

were to proceed to trial, the government would be able to prove the following facts beyond a

4

reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

Cannon and his co-defendant, Margaret Keefe, were involved in a mortgage fraud scheme. From June 2006 through July 2007, Cannon used straw buyers to fraudulently obtain mortgages for numerous properties on the north and northwest side of the city of Milwaukee from various lenders. Cannon operated as the loan officer working through United Lending, a mortgage broker company. As the loan officer, Cannon's job, in theory, was to shop for the best mortgage terms for the buyer from different lenders. In truth, any lender would suffice, and the completed loan applications Cannon caused to be submitted on behalf of the straw buyer contained fraudulent information which the lender relied upon in determining whether to fund the loan. Cannon fraudulently profited from the transactions by taking money at the closing. Checks issued by the closing agent, Margaret Keefe, were made payable to Cannon's companies, or to an associate who would sign over the checks to Cannon. These payments were inconsistent with the distribution of funds reflected on the settlement statement. Typically, Cannon received more than $20,000 from each closing under the ruse that the funds would be used to make repairs on the properties. In truth, Cannon did not repair the properties. Instead, he used the money to fund additional real estate transactions.

Several straw buyers in the scheme were interviewed and provided the following information. The straw buyers were typically paid a fee by Cannon or his associate for each property purchased, and the straw buyers purchased numerous properties at the same time before those items appeared on their credit score. The straw buyers did not identify the properties to be purchased, did not look at the properties before purchase, and did not have any input with regard

5

to purchase price. After closing, the straw buyers did not make mortgage payments on the properties. If the mortgage was paid, it was done for a few months by another scheme participant to prevent the lender from suspecting fraud. The straw buyers did not pay closing costs, or if they did, they were immediately reimbursed. After closing, the straw buyers rarely received keys to the properties they purchased. Those straw buyers that did obtain access to the properties indicated that the homes were in disrepair, sometimes uninhabitable due to code violations, and could not be worth the purchase price. Nearly all the properties involved in the scheme went into foreclosure shortly after their purchase. As a result, numerous mortgage lenders involved in the scheme suffered significant losses.

Loan applications submitted to lenders by Cannon contained material misrepresentations which made the straw buyers more appealing candidates for a mortgage. For instance, the loan applications falsely indicated that the buyer would live in the property. This was done to insure full funding for the purchase of the property. Otherwise, if a property is not owner occupied, lenders require greater funds out of pocket from the buyer for a down payment. The loan applications also failed to disclose other properties purchased by the buyer. Lenders, therefore, could not accurately assess whether the buyers could afford the new mortgage. The loan applications also misrepresented marital status, income, savings in bank accounts, employment, and earnings from previous years. False rental verification notices for the subject properties also showed that the subject properties were producing income. In fact, the properties were sometimes vacant or not renting for the amount represented.

Generally, lenders provide closing instructions to the closing agent or title company setting forth the requirements that must be met at closing. In a legitimate real estate transaction,

6

the funds disbursed at the closing are typically made payable to the seller. All payments and disbursements are required to be accurately recorded in the HUD-1 or settlement statement. Many lenders require a copy of the final HUD-1 prior to funding a loan. In executing this scheme, the settlement statement reflected that the seller received the bulk of the funds from the real estate transaction. As the closing agent, Keefe prepared a check consistent with the amount payable to the seller in the HUD-1 to make it appear as a legitimate transaction. This check, however, was only for show and was voided after its issuance by the title company. Contrary to the settlement agreement, Keefe then drafted checks payable to both the seller and to Cannon. These payments to Cannon were not disclosed to the lender. Moreover, in order to conceal the payments he received, Cannon had Keefe make checks payable to a nominee or to one of his companies, typically Alledi and Associates. Cannon's companies have no employees and he is the sole owner.

### Count Three

On May 15, 2007, Cannon submitted a materially false Uniform Loan Application (ULA) for the purchase of a property on N. 35th Street in Milwaukee, WI. B.D., the straw purchaser, never saw the home prior to its purchase and did not negotiate the $140,000 sales price. B.D. provided his personal information to Cannon over the telephone to complete the ULA requesting a $126,000 mortgage. Cannon and B.D. signed the ULA on May 15, 2007, and closed on the property the same day. The ULA submitted to the lender (1) falsely reflected that the home would be the buyer's primary residence, (2) falsely indicated that the buyer paid $500 a month in rent; (3) falsely reflected $19,000 in the buyer's checking accounts, and (4) overinflated the value of the home by $40,000.

7

The HUD-1 was also materially false. It reflected that B.D. brought

$14, 227.82 to closing. In truth, on May 15, 2007, Cannon obtained a cashier's check from the Alledi and Associates account at U.S. Bank for this amount. The check was made payable to the title company and listed B.D. as the remitter.

The HUD-1 also reflected that the seller would receive $39,277.92 as proceeds from the sale. However, instead of the seller benefitting from the transaction, a check issued by Keefe, the closing agent, was made payable to Alledi and Associates, Cannon's business. Cannon also received a check for approximately $4,500 from United Lending for brokering the deal. In all, Cannon received a total of $43,733.03 from this single transaction. On May 16, 2007, Cannon deposited $15,000 of the $43,733.03 from the above transaction into his Alledi and Associates account at U.S. Bank. Cannon received approximately $19,000 in cash, and deposited another $9,000 into a different account at U.S. Bank.

Based on the false ULA and HUD-1, on May 15, 2007, One Choice Mortgage funded the B.D. loan, and $123,599.77 was wired from Regions Funding in Atlanta, GA, to the escrow account at M&I Bank in Milwaukee, WI for Trump Title. One Choice would not have funded the loan if it knew the buyer had not brought the necessary funds to closing.

**Count Five**

Cannon used the money from the above transaction with B.D. to provide money to a borrower to close on two different properties. P.N. was a straw buyer who purchased more than nine homes. In two of the P.N. real estate transactions, Cannon was the loan officer. On or about June 15, 2007, Cannon and P.N. signed ULA's for the purchase of properties on N. 39th Street and Albany Street in Milwaukee, WI. The ULA's both reflected that the borrower would bring

8

funds to the closing. The HUD-1's also reflected that the buyer would bring money to the closing. In particular, the buyer for the N. 39th Street property was required to bring $11,308.88 to closing. Instead, however, Cannon brought money to both closings on behalf of the buyer.

On June 15, 2007, Cannon withdrew a total of $19, 475.76 from the Alledi and Associates account at U.S. Bank and obtained two separate cashiers checks. Both checks were issued by U.S. Bank and both were made payable to Trump Title totaling $11,308.88 (N. 39th Street) and $8,166.08 (Albany Street), respectively. The remitter on both checks was listed as P.N. Cannon submitted both checks to Keefe at the closings on P.N.'s properties with Trump Title.

Based on the materially false ULA and HUD-1, BNC mortgage funded the loan for the N. 39th Street property for P.N. On June 15, 2007, BNC Mortgage in Wilmington, DE wired $107,613.20 to the escrow account for Trump Title at M&I Bank in Milwaukee, WI. BNC would not have funded the loan if they knew the borrower had not actually provided the approximately $11,000 for closing.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

6. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fines: Count Three, 20 years and $250,000; Count Five, 10 years and $250,000. Each count also carries a mandatory special assessment of $100, and a maximum of 3 years of supervised release. The

9

parties further recognize that a restitution order may be entered by the court. The parties'
acknowledgments, understandings, and agreements with regard to restitution are set forth in
paragraph 30 of this agreement.

7.    The defendant acknowledges, understands, and agrees that he has discussed the
relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS IN INDICTMENT

8.    The government agrees to move to dismiss the remaining counts of the indictment
at the time of sentencing.

## ELEMENTS

9.    The parties understand and agree that in order to sustain the charge of Wire Fraud
as set forth in Count Three, the government must prove each of the following propositions
beyond a reasonable doubt:

First, that the defendant knowingly participated in the scheme to defraud or to obtain
money or property by means of material false pretenses, representations or promises, as
described in the indictment;

Second, that the defendant did so knowingly and with the intent to defraud; and

Third, that for the purpose of carrying out the scheme or attempting to do so, the
defendant used interstate wire communication, or caused the use of interstate wire
communication in such a manner as charged in the particular count.

The parties understand and agree that in order to sustain the charge of Money Laundering
as set forth in Count Five, the government must prove each of the following propositions beyond
a reasonable doubt:

First, that the defendant engaged or attempted to engage in a monetary transaction;

10

Second, that the property involved in the monetary transaction is derived from specified unlawful activity;

Third, that the defendant knew the property involved in the monetary transaction is from criminally derived property;

Fourth, the property has a value greater than $10,000.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to

11

withdraw the guilty plea solely as a result of the sentencing court's determination of the
defendant's criminal history.

## Sentencing Guidelines Calculations

14.    The parties acknowledge, understand, and agree that the sentencing guidelines
calculations included in this agreement represent the positions of the parties on the appropriate
sentence range under the sentencing guidelines. The defendant acknowledges and understands
that the sentencing guidelines recommendations contained in this agreement do not create any
right to be sentenced within any particular sentence range, and that the court may impose a
reasonable sentence above or below the guideline range. The parties further understand and agree
that if the defendant has provided false, incomplete, or inaccurate information that affects the
calculations, the government is not bound to make the recommendations contained in this
agreement.

## Relevant Conduct

15.    The parties acknowledge, understand, and agree that pursuant to Sentencing
Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating
the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to
which the defendant is pleading guilty.

## Base Offense Level

16.    The government agrees to recommend to the sentencing court that the applicable
base offense level for the offenses charged in Counts Three and Five is 7 under Sentencing
Guidelines Manual §§ 2B1.1(a)(1), and 2S1.1(a)(1). The defendant does not join in this
recommendation.

12

## Specific Offense Characteristics

17. The government agrees to recommend to the sentencing court that a two-level increase under Sentencing Guidelines Manual § 2B1.1(b)(2)(A) is applicable to the offense level for the offenses charged in Counts Three and Five because the offense involved more than ten victims. The government further agrees to recommend to the sentencing court that a one-level increase is applicable to the offense level for the offense charged in Count Five for money laundering (18 U.S.C. § 1957) under Sentencing Guidelines Manual § 2S1.1(b)(2)(A). The defendant does not join in these recommendations.

## Role in the Offense

19. Pursuant to Sentencing Guidelines Manual § 3B1.1, the government agrees to recommend to the sentencing court that a two-level increase be given for an aggravating role in the offenses charged in Counts Three and Five because the defendant was an organizer, leader, manager, and supervisor. The defendant does not join in this recommendation.

## Acceptance of Responsibility

20. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

13

## Sentencing Recommendations

21. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

22. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

23. The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

24. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

25. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

14

## FINANCIAL MATTERS

26.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

27.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

### Fine

28.     The parties agree to recommend to the sentencing court that no fine be imposed against the defendant.

### Special Assessment

29.     The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

### Restitution

30.     The defendant agrees to pay restitution in the amount ordered by the court. The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The

15

defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S COOPERATION

31.    The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

32.    In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

> a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the

16

government and the judge all must agree that the trial be conducted by the judge without a jury.

b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

33. The defendant acknowledges and understands that by pleading guilty he is

waiving all the rights set forth above. The defendant further acknowledges the fact that his

attorney has explained these rights to him and the consequences of his waiver of these rights. The

defendant further acknowledges that as a part of the guilty plea hearing, the court may question

the defendant under oath, on the record, and in the presence of counsel about the offense to

which the defendant intends to plead guilty. The defendant further understands that the

17

defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

34.     The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

35.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## GENERAL MATTERS

36.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

37.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

38.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

39.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense

18

on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees

19

that no threats, promises, representations, or other inducements have been made, nor agreements

reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

20

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: _____

_____
BILLY CANNON, SR.
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: _____

_____
KENT CARLSON
Attorney for Defendant

For the United States of America:

Date: _____

_____
JAMES L. SANTELLE
United States Attorney

Date: _____

_____
LISA WESLEY
Assistant United States Attorney

21